[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTIONS TO STAY AND COMPEL
1.
This case arises out of a dispute between the parties CT Page 9585 regarding a Reinsurance Agreement between them. This agreement provided for an arbitration process to resolve disputes over insurance coverage. Article 9 of the agreement sets out the agreement on arbitration and reads as follows:
ARTICLE 9 — ARBITRATION
 A. If there is a lack of agreement with respect to the facts or the interpretation of applicable coverage, the FIA shall proceed to adjust the loss with the Insured. If the Reinsurer shall take exception to such loss adjustment, it shall be adjudicated by a Boiler and Machinery Sub-Committee of the FIA Standing Loss Committee.
 B. The FIA Boiler and Machinery Loss Sub-Committee shall be appointed by the FIA Standing Loss Committee and shall consist of five members, two of whom shall be representatives of FIA Members which do not maintain inspection service for boiler and machine insurance; and two of whom shall be representatives of FIA Members which maintain inspection service for boiler and machinery insurance; the fifth member shall be a representative of the Reinsurer involved in the loss.
The plaintiff, Hartford Steam Boiler Inspection and Insurance Company (HSB) informed the chairman of the arbitration panel selected by Industrial Risk Insurers (IRI) purportedly in compliance with Article 9 that it objected to the so-called Phase II arbitration process that was about to commence.
The plaintiff then filed this present action seeking an injunction restraining IRI from proceeding with the arbitration. The claim is made that (1) the IRI Loss Committee failed to follow the methods set forth in Article 9 in selecting the arbitrators and (2) the committee wrongfully imposed arbitration procedures upon the arbitration panel and the parties.
It should be noted, however, that HSB is not merely seeking to restrain the defendant from proceeding with arbitration rather in its pleadings asks the court to in effect enforce the arbitration provision of the agreement by either itself appointing arbitrators pursuant to Article 9 or directing IRI to CT Page 9586 proceed with arbitration in compliance with Article 9 of the agreement.
This then is not a case, based at least on anything now properly before the court, where one or the other side is saying the dispute between the parties is not covered by the arbitration agreement. HSB seems to concede that. IRI on the other hand has filed a motion to stay proceedings in the HSB action and a motion to compel HSB to in effect arbitrate with the panel selected by the IRI Loss Committee. Preliminarily the court should say that the merits of the HSB claim regarding the failure of IRI to comply with the agreement in selecting the arbitrators is not before the court. IRI doesn't appear to be arguing that it is and it would be hard put to do so at this stage of the proceedings since it now simply asserts that the motions to stay and compel have to be granted and that Sections 3 and 4 of the Federal Arbitration Act require such a result because the underlying dispute over insurance coverage is without question arbitrable. IRI also characterizes HSB's complaints regarding the present composition of the arbitration panel as "procedural" and therefore something that should be resolved by the arbitrators. Therefore by the very way IRI has framed the issues before the court the merits of the HSB claim need not be considered.
2.
The arbitration provisions of the agreement between the parties are governed by the terms of the Federal Arbitration Act. The Reinsurance Agreement between IRI and HSB obviously involves interstate commerce so that the agreement falls under the Federal act, Singer v. Jeffries Co., 571 N.Y.S.2d 680, 682 (1991). HSB has not challenged this contention. In any event as to the issues before the court the Connecticut Arbitration Act is not inconsistent with the federal act, see case cited by defendantMattabasett District v. Federal Ins. Co., 2 — 92 CV00957 (ACV) (D. Conn. 1994), also compare broad language of White v. Kampner,229 Conn. 465 (1994) which leaves little doubt as to this especially in light of our courts explicit adoption of the so-called "positive assurance" test set out in United Steelworkersof America v. Warrior Gulf Navigation Co., 363 U.S. 574, 582
(1960) — see White at 229 Conn. Page 472-474.
Although both state and federal law strongly favor arbitration "a person can be compelled to arbitrate a dispute CT Page 9587 only if, to the extent that, and the manner in which he has agreed to do so," Marsala v. Valve Corporation of America,157 Conn. 362, 365 (1969). The Federal Arbitration Act only gives a party a right to obtain an order directing that arbitration proceed in the manner provided for in (the parties') agreement.9 U.S.C. § 4. As the court said in Volt Information SciencesInc. v. Leland Stanford Junior University, 489 U.S. 468, 478.
 ". . . the FAA does not require parties to arbitrate when they have not agreed to do so . . . nor does it prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement . . . It simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms . . . The Act was designed `to make arbitration agreements a enforceable as other contracts, but not more so.'"
The teaching of Volt Information Sciences and White v.Kampner then is that in deciding motions like those presently before the court, the contract for arbitration must be examined using ordinary principles of contract interpretation but with an important proviso based on the policy favoring arbitration. The so-called "positive assurance" test mandates that doubts in the interpretation of contractual language should be resolved in favor of "coverage," that is, arbitration, United Steel Workersof America v. Warrior Gulf Navigation Co., 363 U.S. 574, 582
(1960); Board of Education v. Frey, 174 Conn. 578, 582 (1978).
These principles are important to keep in mind when the question before the court is whether the particular underlying dispute — here loss coverage — was in fact something the parties agreed to arbitrate under the terms of their contract. It is in that context that most motions to stay court proceedings and compel arbitration arise.
Similarly a useful tool to resolve such coverage questions that has been developed by the courts is examining a contract to arbitrate to see whether it contains a so-called "broad arbitration clause" as opposed to a "narrow arbitration clause" If a broad clause is involved it is said that all issues are arbitrable including frivolous claims and the very issue of arbitrability itself; a narrow clause limits the scope of disputes subject to arbitration and practically speaking gives a CT Page 9588 trial court more freedom when it decides motions to stay or compel to rule that a particular dispute was not covered by the agreement, Peerless Importers Inc. v. Local One, 902 F.2d 924, 927 (CA2, 1990). But if one looks at the cases that use these interpretive tools the question before those courts was whether a substantive issue between the parties was in fact arbitrable under the terms of the agreement. For example, cases have held that where there is a broad clause arbitration is not limited to contract claims but can include tort claims, Disston Co. v.Sanduik Inc., 750 F. Sup. 745 (WD Va., 1990) a dispute over who was to pay a contractor required review of the contract and so was arbitrable, Tehran-Berkley Civil Environmental Engineers v.Tippets-Abbett-McCarthy Stratton, 816 F.2d 864 (CA2, 1987). Even with a narrow clause of course a plaintiff seeking to compel arbitration can prevail if it can be shown that the dispute is encompassed by the specific language of the contract clause, CAEIndustries L DV Aerospace Holdings Co., 741 F. Sup. 388 CSD N.Y. 1989); see also Rio Algom Inc. v. Sammi Steel Co., 562 N.Y.S.2d 486
(1990), app. den. 573 N.Y.S.2d 466 (1991) where court held dispute concerning treatment of accrual for environmental costs as determined by accounting firm was arbitrable.
The arbitration clause in this case, Article 9 of the agreement is clearly a narrow clause type agreement. But whether it was a broad or narrow clause agreement is really irrelevant to the question now before the court. The parties do not disagree on whether the underlying dispute as to loss coverage is in fact arbitrable and both parties purport to in fact want arbitration. Thus, interpretative and analytical tools designed to decide whether a particular substantive dispute is arbitrable are not useful and can only confuse the issue. In other words the validity of HSB's claim to have a right to judicial scrutiny of arbitrator selection before this matter proceeds to arbitration does not depend on whether the arbitration clause is broad or narrow or whether the court applies the "positive assurance" test because the bone of contention between the parties is not arbitrability as such but the composition of the arbitration panel and when and if the court can intervene to correct an alleged violation of the agreed upon process to select the panel.
Similarly IRI's reference to cases like John Wiley Sons v.Livingston, 376 U.S. 543, 557 (1964) miss the point. It won't due to cite that case for authority to the effect that "procedural disputes" over the arbitration process should be left to the arbitrator. If Wiley is read closely the so-called "procedural" CT Page 9589 dispute in that case necessarily depended on "how one answers questions bearing on the basic issue" id P. 557 which in Wiley
was the effect of a merger. The court held the "procedural" questions in fact grew out of the dispute and therefore should be decided by the arbitrators. Also courts have held that questions about how the arbitration is to be conducted, timeliness of the submission of the dispute, whether certain preliminary steps must be taken before a dispute is ripe for arbitration and whether a party has taken those steps are all for the arbitrator to decide, see cases cited in Bakery, LaundryAllied Sales Driv. v. Metz Baking, 641 F. Sup. 790, 793-795 (D Minn., 1990) cf Stroh Container Co. v. Delphi Industries Inc.,783 F.2d 743, 747-749 (CA8, 1986), Denhardt v. Trailways Inc.,767 F.2d 687, 689 (CA10, 1985) (timeliness) Nelson v. Great WesternSugar Co., 440 F. Sup. 928, 929 (D. Col., 1977) (laches). Often such disputes as in Wiley are tied into the merits of a claim. But also there is a danger that having parties resort to the courts to decide such issues prior to actual arbitration will lead to dilatory practices discouraging arbitration over issues that arbitrators with their presumed expertise are just as if not more capable to decide than a judge.
3.
How then shall these motions be decided? Sections 52-410 and52-411 of our statutes, to the court at least, do not give as much help to HSB's position as it seems to think. Subsection (c) of § 52-441 refers to § 52-410 applications and this is somewhat confusing since § 52-410 seems to only contemplate applications to the court by a party to an arbitration agreement where the other party refuses to arbitrate — not the case here. In other words the statutes beg the question when read together as to whether a court should preliminarily decide the issues raised by HSB in its suit or leave it to the arbitrators already in place. Also the language of 9 U.S.C. § 4 of the Federal Arbitration Act is not explicit on whether it is meant to cover matters such as the composition of an arbitration panel and whether that is a matter for the courts. Similarly the language in InternationalBrotherhood of Teamsters v. Shapiro, 138 Conn. 51, 65-66 (1951) seems to be dicta in the sense that it involved a case where the arbitrators had already made their award and one side wanted it confirmed and the other side felt it should be vacated because of questions about the authority of the arbitrator to act. It doesn't say what should be done when both sides concede arbitrability and one side wants court proceedings stayed with CT Page 9590 arbitration to proceed. Shapiro is dicta on the precise issue before the court but it is relevant to a solution of the issue before the court as will be discussed shortly.
Suffice it to say that there are very few cases dealing with the precise issue before the court — whether there should be judicial scrutiny concerning composition of the arbitration panel prior to arbitration where a party claims the way the panel was selected violates the agreement. The court found only one case that is directly on point.
That case supports HSB's position but is not a model of clarity and doesn't give much in the way of reasoning to support its position, Atsa of California Inc. v. Continental InsuranceCo., 702 F.2d 172 (CA9, 1983) and 754 F.2d 1394 (CA9, 1985).
True, arbitration is a creature of contract but nothing in the language of the contract provides explicit guidance as to how this question should be resolved. Although there have not been cases the court has been able to find that deal with the precise issue before the court, there have been many cases where courts have dealt with the propriety of judicial scrutiny of a particular arbitrator before arbitration has begun. These cases have not recited the issue strictly as one of contract interpretation. The decisions have turned more on deciding with whether a court is an appropriate forum to resolve the issue and the effect on the arbitration process in allowing judicial scrutiny of this type.
Some of these cases involve situations of so-called tri-partite arbitration schemes where each side to a dispute is authorized to select a certain number of arbitrators. One side complains and seeks to have a court remove an arbitrator or stay arbitration on the bases that a person chosen as one of the arbitrators has such a close relationship to the party who chose the individual that it has the appearance of impropriety. The cases uniformly reject this type of claim saying the parties could have chosen a trade association to arbitrate if they had intended to insure absolute impartiality, Petition of DoverSteamship Company, 143 F. Sup. 738, 741 (SD. N.Y., 1950), cf MarcRich Co. v. Transinsurance Seaways Corp., 443 F. Sup. 386, 387
(SD N.Y., 1978). In York Hanover Holding A G v. AmericanArbitration Association, 1993 WL 159961 (S.D. the court refused to remove an arbitrator on the basis of how he handled certain preliminary motions which the complaining party said showed he CT Page 9591 was biased.
It is understandable why in cases of this type courts refuse to act. There would be a flood of cases in the courts where parties would point to past associations with the opposing party as a reason to disqualify or as in York Hanover run to court where preliminary rulings by an arbitrator made them apprehensive about the final result. But even York Hanover recognizes that in certain situations courts do have the right and it would be advisable for them to remove particular arbitrators. If for example a party shows bias or corrupt motives or a special relationship with a party particularly when it involves the matter to be arbitrated, a court can enjoin particular arbitrators from acting and in that sense interrupt the arbitration process, Gaer Brothers v. Mott, 144 Conn. 303, 307,309 (1957), cf Metropolitan Property Casualty v. J.C. PenneyCasualty, 780 F. Sup. 885, 893, 894 (1991). Gaer, was sympathetic to the plaintiff's claim that unless arbitration were to be stayed it would be required to submit to a prolonged and costly proceeding and the unfair burden of doing so could be avoided if they could prove the bias and collusion they alleged in the court action. Metropolitan Property Casualty makes the same observation saying the policy objective of minimal judicial interference wouldn't be furthered by categorically prohibiting a court from disqualifying an arbitrator prior to arbitration. If arbitration went forward without permitting the relief requested, then if the plaintiff was correct in its bias complaint after the award a court would have to vacate it.
That's exactly the situation which appears to be presented to the court here. If HSB's premise is correct that IRI failed to follow the agreed upon method in appointing the arbitrators, any award could be invalidated on this ground alone apart from the merits of the decision, cf International Brotherhood of Teamstersv. Shapiro supra. Given that same premise HSB would be forced to submit its dispute to arbitrators selected in violation of its agreement, certainly not the case in York Hanover, Petiton [Petition]of Dover Steamship and Marc Rich Company, supra. Also the resolution of this particular dispute is simply a matter of contract interpretation not requiring any particular skill that trained arbitrators or arbitrators experienced in the industry could bring to its resolution. It would be hard to see how the courts could be flooded by claims of relief similar to the HSB action since again its claim rests on questions of compliance with the particular contract provisions of this case and the CT Page 9592 rather mechanical question of whether arbitrators who have been appointed were appointed in accordance with the agreement to arbitrate.
Under all these circumstances it would not encourage expeditious and just arbitration procedures if under the circumstances of this case the courts couldn't review questions as to whether the composition of an arbitration panel violated the agreement of the parties prior to the commencement of arbitration.
One of the primary reasons why parties agree to arbitration is to avoid the delay of court proceedings but another factor is also to secure as arbitrators people who are skilled and experienced in the problems of a particular industry. It is felt that these individuals would be able to bring more knowledge and expertise to the resolution of complicated disputes that may arise. That seems to have been exactly the motive of both parties in this case when they set up their method of choosing arbitrators. It would be completely disruptive of the arbitration process in such industries and have a deleterious effect on the decision to enter into arbitration agreements especially as they deal with methods of selecting arbitrators, if a party claiming that the agreed upon method had not been followed could not get relief in court.
What would be the point of having agreements on the method of arbitration selection? If scrutiny of the method is left to the arbitrators does that mean a subsequent award should not be overturned if a court were later to find the agreed upon method wasn't followed? If a court could overturn an award on this basis what is the point of forcing the parties through an arbitration process which one of the parties claims wasn't being run according to the agreed upon method of arbitrator selection? I think the methods of arbitrator selection like the one agreed upon here are very important in complicated industries. We don't have here some dispute over the application of strictly "procedural" rules such as timeliness or whether one of the parties has gone through the necessary preliminary steps to have a dispute heard — all of these the arbitrators could decide without in all likelihood creating the danger that a final award would be overturned based on what a court might later view as an incorrect procedural decision.
What the court is saying then is that in addition to cases CT Page 9593 where there are claims of overt acts of bias and collusion on the arbitrator's part, in the narrow case where it is claimed arbitrators were not chosen in the specific manner agreed to by the parties, the resolution of that claim is a jurisdictional one which the courts should decide before the arbitrators hear the case on the merits.
In order not to frustrate another important purpose of arbitration however — expeditious handling of these matters — claims such as HSB is making should probably be set down for an early hearing.
The motions to stay court proceedings and to compel arbitration are therefore denied.
Corradino, J.